UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | Case No. 1:23-cv-8543 |
| Plaintiff, | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| v. | |
| **EDWARD O'DONNELL and VICTOR BOZZO,** | |
| Defendants. | |

Plaintiff U.S. Securities and Exchange Commission (the "Commission") files this Complaint against Defendants Edward O'Donnell ("O'Donnell") and Victor Bozzo ("Bozzo") (collectively, "Defendants"), and alleges as follows:

### SUMMARY

1.      This action involves accounting and disclosure fraud orchestrated by Defendants, executives at Pareteum Corporation ("Pareteum"), a now defunct telecommunications and cloud software company based in New York, New York.

2.      From 2018 through mid-2019, Defendants engaged in a fraudulent scheme to recognize revenue, and as a result, Pareteum materially overstated its revenue by $12 million for fiscal year 2018 (60% of the ultimately restated revenue), and by $27 million for the first and second quarters of 2019 (91% of the ultimately restated revenue).

3.      These misstatements resulted from improper accounting practices by Defendants and others, whereby they recorded revenue for unsupported, aspirational amounts related to non-

binding purchase orders, and not in accordance with generally accepted accounting principles ("GAAP").

4.      In addition, O'Donnell took steps to conceal these practices from Pareteum's auditor. In February 2019, as part of its 2018 end-of-year audit testing, Pareteum's auditor sent out audit confirmations to most of Pareteum's customers asking them to sign that they agreed with Pareteum's record of how much was owed to Pareteum as of year-end 2018. O'Donnell interfered with the audit confirmation process by inducing Pareteum customers to incorrectly confirm that they owed the amounts reflected in the audit confirmations – despite knowing the confirmations were not accurate. And then O'Donnell signed the management representation letter provided to Pareteum's auditor confirming that Pareteum's 2018 financial statements were fairly presented in conformity with GAAP.

5.      On October 21, 2019, Pareteum publicly announced that it would issue financial restatements for all of 2018 and the first two quarters of 2019, and that it expected the restatements to reduce the reported revenue by $9 million for all of 2018 and $24 million for the first half of 2019. Following this announcement, Pareteum's stock price dropped 59%.

6.      Pareteum went on to restate its financial results for fiscal year 2018 in a Form 10-K/A filed on December 14, 2020, and reported its financial results for fiscal year 2019, including restated quarterly financial results for the first half of 2019, in a Form 10-K/A filed on March 12, 2021.

7.      On September 2, 2021, the Commission issued an order instituting settled cease-and-desist proceeding which found Pareteum in violation of Section 17(a) of the Securities Act, and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder, and imposing a $500,000 civil

penalty. *Pareteum Corporation*, Securities Act Accounting and Auditing Enforcement Release No. 4247, SEC Release No. 10975, Exchange Act Release No. 92866, 2021 WL 4031174 at 6 (Sept. 2, 2021).

## VIOLATIONS

8.      By virtue of the conduct alleged herein, O'Donnell has violated, directly or indirectly, singly or in concert, or as a control person, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]. By virtue of the conduct alleged herein, Bozzo has violated, directly or indirectly, singly or in concert, Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), and aided and abetted O'Donnell's and Pareteum's violation of Rule 10b-5(b). O'Donnell also has violated Section 13(b)(5) of the Exchange Act and Rules 13a-14, 13b2-1, and 13b2-2 promulgated thereunder, as well as Section 304(a) of the Sarbanes-Oxley Act of 2002 ("SOX"). In addition, O'Donnell aided and abetted Pareteum's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

9.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

10.      The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

11.     The Commission seeks a final judgment: (a) permanently restraining and enjoining Defendants from directly or indirectly engaging in conduct in violation of the laws alleged against them herein; (b) ordering Defendants to disgorge all ill-gotten gains and to pay prejudgment interest on those amounts pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Defendants from acting as officers or directors of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; (e) ordering O'Donnell to disgorge bonuses and incentive-based compensation pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 (SOX 304); and (f) ordering such other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

13.     Defendants directly and indirectly have made use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein.

14.     Venue lies in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of New York and were effected, directly or

indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange. During the relevant period, Pareteum had its principal place of business in the Southern District of New York and its stock was traded on the Nasdaq Stock Market ("Nasdaq"), which also is located in the Southern District of New York.

### DEFENDANTS

15.     **Edward O'Donnell**, age 58, is a resident of East Atlantic Beach, New York. From 2017 to 2019, O'Donnell served as Chief Financial Officer ("CFO") of Pareteum, oversaw its financial reporting, and signed the Sarbanes-Oxley ("SOX") certifications for all quarterly and annual reports Pareteum filed. He is a registered Certified Public Accountant ("CPA"), having received his license in 1996 from New York. In November 2019, Pareteum's board of directors replaced O'Donnell as CFO, and in 2020, O'Donnell was asked to separate from the company following Pareteum's internal investigation into the conduct described herein.

16.     **Victor Bozzo**, age 55, is a resident of Ringoes, New Jersey. Bozzo served as the Chief Commercial Officer of Pareteum from May 2019 to June 2020, and as the Chief Executive Officer of Pareteum from November 2016 to May 2019. In June 2020, Pareteum entered into a Separation Agreement with Bozzo, requiring him to resign following Pareteum's internal investigation.

### RELATED ENTITY

17.     **Pareteum Corporation** was a telecommunications and cloud software company incorporated in Delaware with a principal place of business in New York, New York. Pareteum's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act, and prior to November 12, 2020, traded on the NASDAQ exchange under the

symbol "TEUM." It then traded under the same symbol on the OTC Markets Group Inc.'s Pink Open Market, until filing for bankruptcy on May 15, 2022.

## TERMS USED IN THIS COMPLAINT

18.    **Accounting Standards Codification** ("ASC") are accounting standards defined by the Financial Accounting Standards Board ("FASB"). Since July 2009, the ASC has been the single official source of authoritative, nongovernmental U.S. generally accepted accounting principles.

19.    **Generally Accepted Accounting Principles** ("GAAP") refers to a common set of accounting rules, requirements, and practices issued by the FASB and the Governmental Accounting Standards Board ("GASB"). Public companies in the U.S. are required to follow GAAP when completing their financial statements.

## FACTS

20.    Pareteum was a telecommunications "Software as a Service" company that offered various products including Subscriber Identity Module ("SIM") cards, WiFi service, and a Cloud-based platform. Pareteum's customers were telecommunications businesses that contracted with Pareteum for services and materials, and then sold those products directly to downstream users.

21.    Pareteum was originally formed in 2001 as Elephant Talk Communications Corp., and its stock began trading on the New York Stock Exchange under the ticker symbol "ETAK" in 2011. In 2015, the company was rebranded as Pareteum and started trading under the ticker symbol "TEUM" in November 2016. In late 2018, Pareteum moved its listing to the NASDAQ.

**A. Background Regarding GAAP, ASC 606, and Pareteum's Practices, Generally.**

22.     Under GAAP, and as disclosed in Pareteum's financial statements, revenue from Pareteum's contracts with customers was to be recognized in accordance with ASC Topic 606, "Revenues from Contracts with Customers" ("ASC 606"). ASC 606 requires entities to recognize revenue only when control of the promised goods or services is transferred to customers, and at an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services when such transfer has been completed.

23.     ASC 606 requires companies to take the following five steps to assess whether and what revenue should be recognized: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to the corresponding performance obligation(s); and (5) recognize revenue when or as the company satisfies a performance obligation by transferring control of a promised good or service to a customer.

24.     Pareteum violated GAAP generally, and failed to meet the requirements of ASC 606 in particular, in multiple ways. First, Pareteum routinely recognized revenue on the basis of non-binding purchase orders without a formal contract in place. Second, Pareteum failed to identify each performance obligation agreed to with the customer. Third, Pareteum failed to determine and allocate the transaction price across those same performance obligations. And fourth, Pareteum recognized revenue with no regard to Pareteum's satisfaction of performance obligations.

25.     For numerous customers, instead of recognizing revenue in accordance with GAAP, Pareteum recognized the entire amount of the customer's initial purchase order signed

with Pareteum, even though these purchase orders were only a preliminary step toward a contract and were non-binding.

26.     A large number of Pareteum customers were businesses that purchased SIM cards with customizable service plan options from Pareteum.  These businesses would in turn sell the SIM cards with service plans to downstream users under their own brand.  Pareteum worked with these businesses to set up their platform and front office capabilities so that they could sell products to end-user consumers.

27.     Pareteum salespersons drew up purchase orders for Pareteum customers that provided the number of SIM cards that the customer hoped to purchase, as well as an estimated cost for the average monthly plan the customer expected to sell to downstream users.  For most customers, this purchase order then listed the total of the cost of all the SIM cards as well as the estimated monthly total plan cost once activated by downstream users.

28.     The customers understood that the amount of SIM cards included on the purchase orders were just aspirational estimations – they represented a planned number of SIM cards and a forecast of what the customer expected to be able to sell to downstream users, with a commitment to pay Pareteum according to the purchase order's terms only if those downstream sales were successful.

29.     O'Donnell and Bozzo knew that the purchase orders were non-binding aspirational sales estimations by Pareteum's customers.

30.     Importantly, most of Pareteum's customers were not obligated to pay the purchase order amounts until all of the following took place: (1) the SIM cards had been shipped to them, (2) the platform supporting the SIM cards had been set up, customized, and confirmed

operational, and (3) the SIM cards were sold to downstream users and officially activated. Language to this effect was sometimes included in the purchase order itself.

31.    Accordingly, Pareteum's general practice was not to send a billing invoice for the full amount of the purchase order, and instead to send monthly invoices for the actual monthly usage amounts once the SIM cards were in use by downstream users, further demonstrating that the customer was not responsible for the full purchase order amount.

32.    Because of this contingency, the purchase orders were essentially consignment agreements, and Pareteum should not have recognized revenue for the full amount of a purchase order until all three of the above noted steps were satisfied (in addition to any other performance obligations agreed to by Pareteum and the customer).

33.    O'Donnell and Bozzo knew that Pareteum's SIM card customers were not committed to paying unless and until the SIM cards were sold to downstream users and officially activated.

34.    Bozzo, who supervised Pareteum's salespeople, directed the sales department personnel to focus on getting signed purchase orders from customers.

35.    Bozzo then directed that these purchase orders be sent to O'Donnell so the amounts could be recognized as revenue, despite knowing that they did not meet the requirements of ASC 606.

36.    O'Donnell and Bozzo knew that in many instances the full amount of purchase orders was recognized as revenue despite the fact that the purchase orders were non-binding and without confirming that Pareteum had completed the required steps outlined above.

37.    In fact, O'Donnell and Bozzo knew that in many instances the full amount of purchase orders was recognized as revenue prior to the SIM cards even being shipped – and for

many customers, those SIM cards were never shipped, let alone activated. In certain instances, Bozzo personally directed such revenue to be recognized, and Pareteum's finance department, under O'Donnell's supervision, did improperly recognize such revenue.

38.    O'Donnell oversaw Pareteum's financial reporting and signed the Sarbanes-Oxley (SOX) 302 and 906 certifications included in all quarterly and annual reports filed by Pareteum during the relevant time period – including all 2018 10-Qs, the 2018 10-K filed on March 18, 2019, and in the associated press release included in a Form 8-K filed on March 12, 2019, as well as the Q1 2019 and Q2 2019 Form 10-Qs and related Form 8-Ks filed in May 2019 and August 2019, respectively. Despite knowing that the revenue amounts in each of these filings included amounts based on purchase orders that had not satisfied the requirements of ASC 606, O'Donnell signed off on these financial filings.

39.    Further, as CFO of Pareteum, O'Donnell was responsible for ensuring that Pareteum maintained internal accounting controls, including effective revenue recognition policies and procedures to ensure that Pareteum adhered to the requirements of ASC 606 and properly recognized revenue. However, Pareteum did not have internal accounting controls in place to provide reasonable assurance that ASC 606 was followed and revenue properly recognized.

40.    For example, Pareteum lacked policies and procedures to require sufficient review of the purchase orders' payment terms as well as a process to provide reasonable assurance that Pareteum's performance obligations under a purchase order were identified and met for revenue recognition purposes. In addition, because Pareteum lacked a formal process for identifying performance obligations, it similarly lacked a process for allocating the transaction price to each performance obligation for revenue recognition purposes.

41.     O'Donnell failed to implement adequate revenue recognition policies and procedures. Instead, O'Donnell directed Pareteum's finance department to recognize revenue for the full amount of any purchase order provided by the Pareteum sales department without checking whether any of the required performance obligations had been met.

42.     As a result of this unlawful conduct, from 2018 through the first half of 2019, O'Donnell and Bozzo engaged in a fraudulent scheme that resulted in Pareteum inappropriately recognizing over $39 million in revenue, rendering the corresponding financial statements issued by Pareteum unreliable and ultimately leading to a restatement.

43.     In light of the above-alleged facts [and other facts alleged herein], including the circumstances leading to the accounting entries, as well as their own background and job responsibilities, O'Donnell and Bozzo knew or were reckless in not knowing that recording the revenue described above for all of 2018 and the first and second quarter of 2019 was improper and did not comply with GAAP.

## B. Example 1: Pareteum and the Defendants Improperly Recognized $4 Million of Revenue in the First Quarter of 2019.

44.     In the first quarter of 2019, Pareteum recognized over $4 million in revenue based on a January 2019 purchase order for 500,000 SIM cards for Customer 1, a start-up with no current customer base, but which projected sales based in part on its connections to some Instagram influencers with large followings. The revenue associated with Customer 1 was the largest amount Pareteum recognized for a single customer in that quarter, and accounted for 20% of Pareteum's reported revenue.

45.     It was O'Donnell's practice and responsibility as CFO to do a more detailed review of larger revenue entries each quarter and ensure that they complied with GAAP and met the criteria required by ASC 606. As a part of that review of the booked revenue, just a few days

before the first quarter closed on March 28, 2019, O'Donnell asked Pareteum employees to create an invoice for and ship all 500,000 SIM cards to Customer 1 to create additional support for the recognized revenue amount. However, O'Donnell never intended that the invoice be sent to Customer 1, and he never checked whether the SIM cards were shipped. In fact, no invoices were prepared or sent, and no SIM cards were shipped as Customer 1 was not prepared to receive them.

46.    In the Form 10-Q for quarter 1 2019, filed on or about May 10, 2019, Pareteum recognized $23 million in revenue, of which $4.6 million was revenue attributed to Customer 1 based solely on the non-binding purchase order. O'Donnell knew that recognizing this revenue was improper and did not comply with GAAP because the revenue did not meet the requirements of ASC 606.

47.    During quarter two, on May 14, 2019, O'Donnell received a forwarded email from a Finance department employee which stated that only 73,000 SIM cards had been shipped to Customer 1 so far, and only 11 test SIM cards were active.

48.    In a separate email chain on May 24, 2019, Bozzo also learned that Customer 1 had received only 73,000 SIM cards and only 11 test SIM cards were active. When an employee suggested that Pareteum should at least send an invoice to Customer 1 for the 73,000 SIM cards received, Bozzo immediately responded, "We should talk about this first."

49.    When asked on June 3, 2019 if the $4 million in revenue recognized for Customer 1 was "unbilled," O'Donnell answered that it was only due "upon SIM activation," meaning when Customer 1 had sold the SIM services to a downstream user, adding, "[Customer 1] will freak out if they receive a large bill."

50.    Despite having actual knowledge as of May 14, 2019 that only 73,000 SIM cards

had shipped, no SIM cards had been activated by downstream users, and that Customer 1

accounted for 20% of the revenue Pareteum had recognized in the first quarter of 2019,

O'Donnell made no attempt to adjust or restate the recognized revenue amount.

### C. Example 2: Pareteum and the Defendants Improperly Recognized $4.4 Million of Revenue Based on an Unsigned Purchase Order Over the First and Second Quarters of 2019.

51.    In late January 2019, Pareteum and Customer 2 were negotiating a purchase order

for Customer 2 to purchase International Mobile Subscriber Identity numbers, or IMSIs, from

Pareteum.  Unlike SIM cards, IMSIs are "virtual," and do not require the shipment of any

physical product – instead, Pareteum needed to ensure the necessary software platform was set

up and assign and email the relevant IMSI numbers to Customer 2.  Like the SIM card purchase

orders, Customer 2 and Pareteum understood that Customer 2 would not have to pay for IMSIs

until they were put into use by its customers, the downstream users of the IMSI mobile service.

52.    A Pareteum sales employee drafted a non-binding purchase order for 6.3 million

euros (~$7.2 million), which forecasted the amount Customer 2 would owe for 10 million IMSIs,

and circulated an unsigned version internally for approval.  On January 30, 2019, Bozzo

approved the terms and authorized the Pareteum sales employee to get it signed by the customer.

53.    That same day, before Customer 2 had even agreed to the non-binding purchase

order, Bozzo told a Finance department employee that he wanted to "discuss what we take now,"

i.e. what revenue they should recognize from the purchase order.  Although the order did not

require a physical shipment, it did require Pareteum to digitally deliver the IMSI and set up the

software platform, both necessary steps to allow revenue to be recognized in compliance with

ASC 606.

54.    The sales employee also had made clear to Bozzo that Customer 2 was only going to pay for usage once the IMSIs were in use by a downstream user. However, Bozzo directed Pareteum's finance department to recognize 20% of the purchase order in January 2019. Bozzo knew there was no basis for recognizing 20% of the purchase order. Nevertheless, based on Bozzo's direction, this amount, approximately $1.4 million, was included in Pareteum's revenue for the first quarter of 2019.

55.    The sales order did not meet the criteria for revenue recognition. First, Customer 2 had not actually agreed to purchase 6.3 million euros worth of product – the purchase order was not yet signed, and even if it had been, Customer 2 was told by the sales employee that payment would only be due once the IMSIs had begun being used -- so there was no contract under Step 1 of ASC 606. In addition, Pareteum had not emailed Customer 2 any of the IMSIs called for on the purchase order, nor had it set up the software platform. Indeed, Bozzo had only received the draft purchase order one day before the end of the month, and thus Bozzo knew it could not have been possible for the ISMIs to have been sent and operational within the next 24 hours. Finally, the Finance department employee did not allocate the transaction price to identified performance obligations, which did not meet the requirements of ASC 606, and had no basis or reason for specifically recognizing 20% of the unsigned and unfulfilled purchase order amount – other than the fact that Bozzo had told him to do so.

56.    Meanwhile, the Pareteum sales employee ultimately finalized a purchase order with Customer 2 in mid-February 2019 – but it was for 630,000 euros, not 6.3 million euros, and it included language further clarifying that Customer 2 was not yet committed to paying the amount. At the end of February, despite now having a signed purchase order with the same customer for a completely different amount and having received no other information regarding

14

execution of the initial purchase order, Bozzo directed another Pareteum employee to recognize another 20% of the 6.3 million euro purchase order despite knowing it did not meet the requirements of ASC 606.

57.    In early May 2019, Bozzo became aware of a $2 million shortfall against Pareteum's internal revenue goals for April 2019, and decided to recognize another 20% of the original Customer 2 purchase order of 6.3 million euros (or approximately $1.5 million) despite knowing it did not meet the requirements of ASC 606.

58.    A few days later, O'Donnell confirmed that the platform supporting the IMSIs for Customer 2 was still not yet up and running.  Despite knowing that a key performance obligation of the initial purchase order had not been met, O'Donnell did nothing to question or reverse the large amounts of unsupported revenue already recognized during the first quarter of 2019. Instead, O'Donnell directed another Pareteum employee to recognize this additional $1.5 million in revenue from the unsigned 6.3 million euro purchase order in Pareteum's financial statements for the second quarter of 2019 despite knowing it did not meet the requirements of ASC 606.

59.    Ultimately, because of the misconduct by Bozzo and O'Donnell, Pareteum recognized a total of approximately $4.4 million in revenue for Customer 2 in the first and second quarter of 2019, before the platform for Customer 2's IMSIs was even functional and despite the fact that the signed agreement was only for 630,000 euros, or approximately $750,000 – an amount that was still contingent on the IMSIs being used by downstream users, and therefore not recognizable revenue.

### D.  O'Donnell and Bozzo Attempted to Cover Up the Improperly Recognized Revenue for Customer 2 by Obtaining a Back-Dated Purchase Order.

60.    On August 13, 2019, the SEC issued a subpoena to Pareteum requesting, among other things, documentation supporting the revenue recognized for Customer 2 for the first and

second quarter of 2019. In preparing its response, Pareteum failed to find any support for the revenue amounts recognized for Customer 2. By this point, some of Pareteum's management, including O'Donnell and Bozzo, had become aware that the initial 6.3 million euro purchase order that had been relied upon was never even signed by Customer 2.

61.     In response, in the weeks that followed, Pareteum executives began attempts to cover up the improper revenue recognition.

62.     In or about August of 2019, O'Donnell directed a Pareteum sales employee to try to get the original draft purchase order signed but backdated to January of 2019, including by telling Customer 2 that the purchase order was not an invoice and would not need to be paid. But the CTO and co-founder of Customer 2 initially refused, explaining that Customer 2's board would not agree to do so.

63.     The Pareteum sales employee then offered that Pareteum could agree to use a different entity founded by Customer 2's founders, i.e., Customer 3, as a service provider in exchange for Customer 3 signing a separate purchase order for IMSIs in the amount Pareteum was looking for. Customer 2's CTO agreed, so long as Pareteum prepaid a $60,000 setup fee for Customer 3's services upfront, telling the Pareteum sales employee, "[a]s I said you need a document and I need small money."

64.     O'Donnell signed an agreement to use Customer 3 as a service provider and prepay the associated setup fee – which, from O'Donnell's, Bozzo's, and others' point of view, was just a way to ensure Customer 3 would sign Pareteum's purchase order. Bozzo signed a purchase order for the $60,000 setup fee, and the Finance department sent Customer 3 a wire transfer for the $60,000. Customer 3 then signed a purchase order, backdated to January 2019, for 4.4 million euros –the amount of revenue already recognized by Pareteum. Bozzo,

O'Donnell, and others were frequently updated on these efforts, and were told when the replacement purchase order was received from Customer 3. Ultimately, this falsely backdated purchase order was never used to support the revenue amount in response to the subpoena.

### E. Bozzo Asked Pareteum Employees to Hide Information From an Employee Who Raised Concerns.

65.    In April 2019, a newer Pareteum employee who had been tasked with trying to collect the recognized revenue amounts began to look into why the outstanding accounts receivable were so high. The employee discovered information related to the fraudulent revenue recognition practices at Pareteum and raised them to Bozzo – including that (a) customers were contractually required to pay only on activation, not shipment, (b) some revenue had been recognized in advance of shipment, (c) $8 million in revenue recognized in 2018 related to customers who were still not "live" as of April 2019, and (d) approximately 27 customers for which revenue was recognized were currently stalled projects and were not returning Pareteum's calls. The employee, who did not have a background in finance, suggested that the issues be raised to O'Donnell and the Finance department in order to "take a look at the situation from a financial perspective."

66.    Bozzo knew the employee's concerns were well founded and the revenue had been improperly recorded. But, in response to these concerns, Bozzo took no steps to correct the inappropriately recorded revenue or implement internal accounting controls. Instead, Bozzo asked other Pareteum employees to hide information from the new employee who had raised the concerns. In addition, Bozzo told the other Pareteum employees to keep discussions around collecting revenue out of any emails sent to him, i.e., Bozzo. The newer employee who had raised these concerns was ultimately reassigned, and left the company shortly thereafter.

**F. O'Donnell Manipulated the Audit Confirmation Process and Misled Pareteum's Auditor Regarding its Accounts Receivable.**

67.    In February 2019, when Pareteum's auditor performed its 2018 end-of-year audit testing, it identified Pareteum's accounts receivable as a main risk area.  To test the validity of the accounts receivable amounts, the auditor sent audit confirmations to most of Pareteum's customers that accounted for the $12 million in revenue that Pareteum improperly recognized in 2018 and asked those customers to sign that they agreed with Pareteum's record of how much was owed to Pareteum as of year-end 2018.

68.    Because these customers did not in fact owe Pareteum the amounts associated with the inappropriately recognized revenues, they had no basis to sign the audit confirmations.  Indeed, many of these customers did not initially return the confirmation to the auditor.  In response, O'Donnell determined that Pareteum should reach out to these customers to encourage them to sign and return the audit confirmations since the confirmations were needed to complete the audit.

69.    To induce each customer to sign the audit confirmation, O'Donnell provided specific language for Pareteum's sales department personnel to use with the customer, telling customers that the amounts on the confirmations were forecasts or estimates and did *not* represent amounts that the customer was actually committed to paying.  Specifically, at O'Donnell's direction, sales personnel emailed customers about the audit confirmation letters: "Note that this isn't a contractual commitment, rather a statement that you intend to buy and use the services," "it is just a forecast," and "there is no commitment."  With these (incorrect) assurances, most of these customers signed the audit confirmations, thereby unknowingly providing false audit evidence to the auditor.

70.    O'Donnell knew that the audit confirms did not credit "forecasts" or "estimates", but instead sought to confirm amounts that the auditors understood were actually owed to Pareteum.

71.    O'Donnell received updates from Pareteum sales executives regarding their efforts to convince customers to sign the false confirmations.  For example, one sales executive, when emailing that he had gotten a customer to sign the audit confirmation, told O'Donnell, "magic being worked as you can see."

72.    Another sales executive forwarded O'Donnell the message he had sent to a customer asking him to sign the audit confirmation, which included the assurance to the customer that it was "just a forecast of potential services revenues on SIMs."  O'Donnell responded, "Thank you."

73.    O'Donnell knew that the audit confirmations should not have been issued to the customers in the amounts that matched the recognized revenue, nor confirmed by the customers in those amounts and returned to the auditor, as the customers were confirming amounts not in fact owed to Pareteum.

74.    Despite this knowledge, O'Donnell signed the management representation letter that was provided to Pareteum's auditor on or about March 18, 2019 in connection with the 2018 year end audit which falsely stated that Pareteum's 2018 financial statements were fairly presented in conformity with GAAP.

75.    For later audits (such as Q1 2019 and Q2 2019), O'Donnell continued to be the auditor's main point of contact, and he continued to mislead the auditor regarding Pareteum's ballooning AR balance.

76.     When directly asked about the large AR balance by one audit manager, in or around April 2019, O'Donnell falsely blamed the large balance on administrative delay in sending out bills, rather than admitting that the AR balance was overstated due to Pareteum having improperly recognized revenue that did not meet the criteria required under ASC 606.

### G. Pareteum Announced Intent to Restate its Financial Statements.

77.     In October 2019, Pareteum's Board of Directors determined that Pareteum's revenue recognition practices had been improper and in violation of GAAP.

78.     On October 21, 2019, Pareteum publicly announced that it would be issuing financial restatements for all of 2018 and the first two quarters of 2019, and that it expected the restatements to reduce the reported revenue by $9 million for all of 2018 and $24 million for the first half of 2019. As a result, Pareteum's stock price dropped 59%.

79.     On December 14, 2020, Pareteum filed a Form 10-K/A for the year of 2018, and on March 12, 2021, Pareteum filed a Form 10-K for the year of 2019, which included restated financial statements for the first two quarters of that year. These restatements reduced Pareteum's reported revenue (rounded to the nearest thousand) as follows:

|  | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|
| **Reported Amount** | $4,112,000 | $6,003,000 | $8,007,000 | $14,312,000 | $23,040,000 | $34,148,000 |
| **Restated Amount** | $3,650,000 | $3,878,000 | $3,999,000 | $8,729,000 | $13,069,000 | $16,876,000 |
| **Percent of Overstatement** | 12.7% | 54.8% | 100% | 64% | 76% | 102% |

80.     Pareteum's restated 2018 10-K further disclosed that Pareteum's management had identified material weaknesses in Pareteum's internal control over financial reporting, including a lack of proper controls around recognizing revenue and an ineffective overall control environment due to issues with management's "tone at the top."

**H. Defendants Received, and Did Not Return, Performance-Based Bonuses.**

81.    O'Donnell and Bozzo personally obtained bonuses tied to Pareteum reaching revenue targets, which were solely met due to the falsely inflated recognized revenue amounts in 2018 and 2019.

82.    Pareteum's management determined the amount of the bonus by assessing four company goals, one of which was revenue.  Revenue, which Pareteum had materially misstated in its Form 10-K for 2018, was the only company goal where Pareteum exceeded its target and was a predominant factor in determining Defendants' performance bonuses.

83.    In 2019, Bozzo received a performance bonus of approximately $225,000 based on Pareteum's performance for 2018, including recognized revenue.

84.    In 2019, O'Donnell received a performance bonus of approximately $60,000 based on Pareteum's performance for 2018, including recognized revenue.

85.    As noted above, on December 14, 2020, as a result of having filed a Form 10-K for 2018 that was in material non-compliance with financial reporting requirements, Pareteum filed an amended Form 10-K ("Form 10-K/A") for 2018 which reported a total overstatement of revenue of approximately $12,178,000.

86.    Following the filing of Pareteum's Form 10-K/A for 2018, neither O'Donnell nor Bozzo returned to Pareteum the bonus received in 2019.

87.    The Commission did not exempt O'Donnell, pursuant to Section 304(b) of the Act, 15 U.S.C. § 7243(b), from his obligation as CFO to reimburse Pareteum for his 2019 bonus pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)].

88.    The Defendants also owned Pareteum stock and/or stock options, and increasing Pareteum's stock price (and ultimately attracting a buyer for the company) was a motivating factor in the Defendants' actions misrepresenting the revenue amounts.

### FIRST CLAIM FOR RELIEF
### Fraud in Connection with the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act
### (O'Donnell and Bozzo)

89.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 88 above as if fully set forth therein.

90.    By engaging in the conduct described above, O'Donnell and Bozzo, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails,

      a.    Knowingly or recklessly have employed one or more devices, schemes, or artifices to defraud;

      b.    Knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

      c.    Knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

91.    By engaging in the conduct described above, O'Donnell and Bozzo have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (O'Donnell)

92.    The Commission re-alleges and incorporates by reference Paragraphs 1 through 88 above as if fully set forth therein.

93.    By engaging in the conduct described above, O'Donnell, directly or indirectly, in connection with the purchase or sale of securities, and by use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, has, knowingly or recklessly:

      a.  employed devices, schemes, or artifices to defraud;

      b.  made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

      c.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

94.    By reason of the actions alleged herein, O'Donnell violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
**Fraud in Connection with the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (c) Thereunder**
**(Bozzo)**

95.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 88 above as if fully set forth therein.

96.     By engaging in the conduct described above, Bozzo, directly or indirectly, in connection with the purchase or sale of securities, and by use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, has, knowingly or recklessly: employed devices, schemes, or artifices to defraud; and/or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

97.     By reason of the actions alleged herein, Bozzo violated, and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

### FOURTH CLAIM FOR RELIEF
**Fraud in Connection with the Purchase or Sale of Securities-Aiding and Abetting**
**Pareteum's and O'Donnell's Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(b) Thereunder**
**(Bozzo)**

98.     The Commission re-alleges and incorporates by reference Paragraphs 1 through 88 above as if fully set forth therein.

99.     By engaging in the conduct described above, Bozzo knowingly  provided substantial assistance to Pareteum and O'Donnell who, directly or indirectly, in connection with the purchase or sale of securities, and by use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, have, knowingly or recklessly, made untrue statements of material fact or omitted to state material facts necessary in

order to make the statements made, in the light of the circumstances under which they were made, not misleading.

100.    By reason of the actions alleged herein, Bozzo aided and abetted Pareteum's and O'Donnell's violations of, and, unless enjoined, will again aid and abet violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

**FIFTH CLAIM FOR RELIEF**
**Periodic Reporting Violations-Aiding and Abetting Pareteum's**
**Violation of Exchange Act 13(a) and**
**Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**
**(O'Donnell)**

101.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88 as if they were fully set forth herein.

102.    By engaging in the conduct alleged above, O'Donnell knowingly  provided substantial assistance to Pareteum, an issuer of securities registered pursuant to Section 12 of the Exchange Act, which filed materially false and misleading current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the SEC that made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by making material misstatements concerning its revenue in its 2018 and first half of 2019 10-K, 10-Qs, and 8-Ks containing earnings announcements, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13.

103.    By engaging in the conduct alleged above, Defendant O'Donnell aided and abetted Pareteum's violations of, and, unless enjoined, will again aid and abet violations of,

Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

### SIXTH CLAIM FOR RELIEF
**Signing False Certification Pursuant to SOX 302**
**Violation of Exchange Act Rule 13a-14**
**(O'Donnell)**

104.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88 as if they were fully set forth herein.

105.    By engaging in the conduct alleged above, Defendant O'Donnell knowingly signed and submitted Section 302 of the Sarbanes-Oxley Act of 2002 (SOX 302) certifications to Pareteum's 2018 Form 10-K, and 2019 Form 10-Qs for the first and second quarter, in which he falsely certified paragraphs 2 and 3 of the SOX 302 certifications.

106.    By reason of the actions alleged herein, O'Donnell violated and, unless enjoined, will continue to violate Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

### SEVENTH CLAIM FOR RELIEF
**Books and Records Violation**
**Violation of Section 13(b)(5) of the Exchange Act**
**(O'Donnell)**

107.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88 as if they were fully set forth herein.

108.    By engaging in the conduct alleged above, with respect to Pareteum's books, records and accounts for periods in 2018 and 2019, Defendant O'Donnell directly or indirectly, knowingly circumvented, or knowingly failed to implement, a system of internal accounting controls to assure that Pareteum's financial statements were prepared in conformity with GAAP or knowingly falsified or caused to be falsified books, records, or accounts, as those terms are

used in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)], of Pareteum subject to

Section 13(b)(5) of the Exchange Act.

109.    By reason of the actions alleged herein, O'Donnell violated and, unless enjoined,

will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

### EIGHTH CLAIM FOR RELIEF
**Record Keeping Violations**
**Violation of Exchange Act Rule 13b2-1**
**(O'Donnell)**

110.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 88 as if they were fully set forth herein.

111.    By engaging in the conduct alleged above, Defendant O'Donnell directly or

indirectly, falsified or caused to be falsified books, records, and accounts of Pareteum subject to

Section 13(b)(2)(A) of the Exchange Act.

112.    By reason of the actions alleged herein, O'Donnell violated and, unless enjoined,

will continue to violate Exchange Act Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

### NINTH CLAIM FOR RELIEF
**Record Keeping Violations-Aiding and Abetting Pareteum's**
**Violation of Section 13(b)(2) of the Exchange Act**
**(O'Donnell)**

113.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 88 as if they were fully set forth herein.

114.    By engaging in the conduct alleged above, with respect to Pareteum's financial

statements for 2018 and 2019, Defendant O'Donnell knowingly provided substantial assistance

to Pareteum, which, in violation of Section 13(b)(2) of the Exchange Act, failed to make and

keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected

Pareteum's transactions and dispositions of its assets and failed to devise and maintain a system

of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP and any other criteria applicable such statements.

115.    Accordingly, O'Donnell aided and abetted and, unless restrained and enjoined, will again aid and abet, violations of Section 13(b) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

**TENTH CLAIM FOR RELIEF**
**Deceit of Auditors**
**Violation of Exchange Act Rule 13b2-2**
**(O'Donnell)**

116.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88 as if they were fully set forth herein.

117.    By engaging in the conduct alleged above, Defendant O'Donnell, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with audits, reviews, or examinations of Pareteum's financial statements or in the preparation or filing of Pareteum's documents or reports required to be filed with the SEC; or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statement were made, not misleading, to an accountant in connection with audits, reviews, or examinations of financial statements or in the preparation or filing of Pareteum's documents or reports required to be filed with the SEC.

118.    By reason of the actions alleged herein, O'Donnell violated and, unless enjoined, will continue to violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## ELEVENTH CLAIM FOR RELIEF
### Failure to Reimburse
### Violation of Section 304 of Sarbanes-Oxley Act of 2002
### (O'Donnell)

119.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 88 as if they were fully set forth herein.

120.    As a result of the misconduct described above, Pareteum was required to prepare an accounting restatement for 2018 and Q1 and Q2 of 2019.

121.    Because Pareteum's 10-K and 10-Qs were in material noncompliance with a financial reporting requirement, O'Donnell was required to reimburse Pareteum for (1) any bonus or other incentive-based or equity-based compensation received and (2) any profits realized from any sales of Pareteum shares during the relevant time frame.

122.    O'Donnell has not reimbursed Pareteum for compensation that he received during the relevant time frame.

123.    The Commission has not exempted O'Donnell, pursuant to Section 304(b) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(b)], from the application of Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)].

124.    By reason of the foregoing, O'Donnell has not complied with Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants O'Donnell and Bozzo from directly or indirectly engaging in conduct in violation of Section 17(a) of the Securities Act [15 U.S.C. §

77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], and further, Defendant O'Donnell from directly or indirectly engaging in conduct in violation of Sections 13(a), 13(b)(2), and 13(b)(5) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, 13a-13, 13a-14, 13b2-1, and 13b2-2 thereunder;

## II.

Ordering Defendants O'Donnell and Bozzo to disgorge all ill-gotten gains and pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## III.

Ordering Defendants O'Donnell and Bozzo to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Prohibiting Defendants O'Donnell and Bozzo from serving as officers or directors of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## V.

Ordering Defendant O'Donnell to reimburse Pareteum for his bonuses and other incentive-based and equity-based compensation, and profits from Pareteum stock sales, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

## VI.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: Philadelphia, PA
       September 28, 2023

Julia C. Green
Karen M. Klotz[*]
Judson T. Mihok
Megan S. Ryan
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
mihokj@sec.gov

---

[*] Application for admission *pro hac vice* to be filed.